ORIGINAL
PAID
49130

FILED

JAN 13 2005

U.S. DISTRICT COURT
FLINT, MICHIGAN

U.S. DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

115

Exh 1-9

05-70137

**LAWRENCE P. ZATKOFF**

**VIRGINIA M. MORGAN**

MICHAEL WHITENER, a
Florida resident,

      Plaintiff,

- vs -

ROBOTIC PIPELINE SOLUTIONS,
L.L.C., a Michigan limited liability company,
KENT WEISENBERRG, a Michigan resident,
TRU-SEAL, INC., an unincorporated business
association now operating as TRU-SEAL, L.L.C.,
a Michigan limited liability company, and
THOMAS DAVIS, a Michigan resident,

      Defendants.

_____/

HYMAN LIPPITT, P.C.
Dean J. Groulx (P51262)
322 N. Old Woodward
Birmingham, Mi 48009
(248) 646-8292
Counsel for Plaintiff

LAW OFFICES OF DAVID S. MENDELSON, P.C.
David S. Mendelson (P53572)
322 N. Old Woodward
Birmingham, Mi 48009
(248) 646-8277
Co-counsel for Plaintiff

---

## COMPLAINT

---

Plaintiff, Michael Whitener, brings this complaint for violations of the Securities Act of 1933, as amended, the Florida Securities and Investor Protection Act, the Michigan Uniform Securities Act; for common law fraud and negligent misrepresentation; and for violation of the "minority oppression" provision of the Michigan Limited Liability Company Act, alleging:

## THE PARTIES

1.      Michael Whitener is a Florida resident, who was solicited as part of an offering to purchase membership interests in Robotic Pipeline Solutions, L.L.C. ("RPS"), a Michigan limited liability company.   Mr. Whitener acquired 7.5% of the authorized membership interests in RPS for $50,000.00, and was granted an option to purchase an additional 2.5% of the authorized membership interests in RPS for cash and services valued at $33,382.35, exercisable on or before May 1, 2004.

2.      Robotic Pipeline Solution, L.L.C. ("RPS") is a Michigan limited liability company.  RPS has transacted business within this District.

3.      Kent Weisenberg is a Michigan resident.  Mr. Weisenberg formed and operated RPS as an unincorporated business association at least as far back as 2002 and, then, organized RPS as a limited liability company on March 9, 2004.  Mr. Weisenberg is the majority membership interest holder in RPS, holding 62.5% of the authorized membership interest in RPS.  Mr. Weisenberg is the titular President and CEO of RPS, holding the title of "managing member," and is the Director of Engineering.  Mr. Weisenberg is also a founder and the Vice President of Tru-Seal, Inc.  Mr. Weisenberg has transacted business within this District.

4.      Tru-Seal, Inc. ("TSI") is a Michigan unincorporated business association.

1

Plaintiff's legal counsel conducted an online search of the Michigan Bureau of Commercial Services' records and is unable to find articles of incorporation for TSI. However, it appears as if Mr. Davis signed and filed Articles of Organization for TSI with the Michigan Bureau Commerce on or about March 30, 2004, thereby organizing TSI as a limited liability company, not as a corporation. TSI is operated and owned, in part, by Mr. Weisenberg and Mr. Davis. TSI's registered office and resident agent (Mr. Davis) are located at 201 Morton Street; Bay City, Michigan 48706. TSI has a place of business and has transacted business within this District.

5.      Thomas Davis is a Michigan resident. Mr. Davis is the President of TSI and, though he holds no formal title or supervisory position at RSP, Mr. Weisenberg and Mr. Davis control and operate RSP.

### JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1331, in that this civil action arises, in part, under the Securities Exchange Act of 1934, as amended. This Court has supplemental jurisdiction over all other claims in this action pursuant to 28 U.S.C. § 1367(a).

7.      Venue is proper in this District pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391.

### FACTUAL ALLEGATIONS

8.      Beginning in at least February, 2004, Mr. Weisenberg began to solicit Mr.

2

Whitener as part of an offering to raise venture capital for RPS. Mr. Weisenberg forwarded to Mr. Whitener a *Tru-Seal Marketing Plan March 2004* as part of the solicitation to Mr. Whitener. (Exhibit 1.)[1]

9. In February and March, 2004, Mr. Weisenberg and Mr. Davis each represented to Mr. Whitener that TSI and RPS worked in tandem and that, due to the interrelationship and cross-pollination between the companies, RPS needed venture capital to complete a robotics unit so that both companies would benefit. Mr. Weisenberg and Mr. Davis also represented to Mr. Whitener that TSI and RPS kept a "tight hold" on operating costs and that, other than needing venture capital to complete a robotic rehabilitation unit, the companies had no other financial constraints or issues which might adversely impact their operations or their ability to move forward with a contract anticipated to be awarded to TSI by the City of Houston.

10. On March 2, 2004, Mr. Weisenberg sent an e-mail to Mr. Whitener. (Exhibit 2.) In that e-mail, Mr. Weisenberg wrote that he was "unable to procure" a copy of the "old RPS business plan" but directed Mr. Whitener's attention to specific pages of the *Tru-Seal Marketing Plan March 2004* to describe RPS's marketing plan and its operation costs. Mr. Weisenberg also wrote "[i]n regard to RPS operations 30% overhead as included here is extremely high. My operations run at a round 18% overhead as I am serious about keeping this line item as loss as possible."

11. In his e-mail, Mr. Weisenberg also represented that Mr. Whitener was being offered a discounted price to purchase the membership interests "based on the following criteria 1. That you will be an "active" participant in the day to day operations of the

---

[1] All exhibits referenced in this Complaint have been tabbed and included in the Exhibit Book to Plaintiff's Complaint, filed and served with this Complaint.

3

business . . ." and "4. [t]hat timing is of the essence. That your investment will be immediate ** and the capital injection will aloe us to move forward rapidly realizing the opportunities we have on the plate currently. As of today I am at a complete stand still on finishing the unit due to financial constraints."

12.    On March 5, 2004, Mr. Weisenberg signed Articles of Organization for Robotic Pipeline Solutions, L.L.C. The articles were faxed to the Michigan Bureau of Commercial Services on March 8, 2004, and the Bureau endorsed and certified the articles on March 9, 2004. (Exhibit 3.)

13.    On March 8, 2004, Mr. Weisenberg sent an e-mail to Mr. Whitener, inquiring about his interest in making an investment in RPS and "additional ownership" opportunities. (Exhibit 4.)

14.    On March 10, 2004, post-organization of RPS as a limited liability company, Mr. Whitener decided to make an investment in RPS and purchased 7.5% of the company's membership interests for $50,000.00. (Exhibit 5.)

15.    On April 6, 2004, the members of RPS executed the Operating Agreement for Robotic Pipeline Solutions, L.L.C., including Mr. Weisenberg and Mr. Whitener. (Exhibit 6.) Pursuant to Section 7.1 of the Operating Agreement, Mr. Weisenberg, Mr. Hallenbeck, and Mr. Whitener were each named a "managing member" of the company.

16.    From the time the Operating Agreement was executed through the filing of this complaint, Mr. Whitener was "squeezed out" of the company's business affairs and operations by Mr. Weisenberg and Mr. Davis.

17.    In an e-mail to Mr. Whitener, dated May 4, 2004, Mr. Weisenberg wrote "[l]et's get this on the table so we can move along productively from here on out. I am the CEO of this company. I own 63% of the stock. I have been working my ass off on it for

three years.  I am Tom's partner in Tru Seal.  **Tom and I and only Tom and I** run the show."  (Exhibit 7.),(emphasis in original.)

18.    In June, 2004, RPS released its Income/P&L Statement for the period January 1, 2004 – May 22, 2004.  (Exhibit 8.)  Through May 22, 2004, RPS had net loss in operating income of ($168,598.06), and a net loss in income of (91,795.30), even factoring in a $25,000.00 loan to the company from Mr. Weisenberg, and $50,000.00 received from the sale of membership interests in the company to Mr. Whitener.

19.    The Income/P&L Statement also reflected: (a) $13,325.44 in uninsured health care costs for Mr. Weisenberg; (b) $2,835.52 in lease payments to Mr. Weisenberg; (c) $7,998.00 in credit card payments;  and (d) $4,484.80 in travel/expenses/per diems.

20.    RPS did not use the $50,000.00 Mr. Whitener invested in RPS to complete a robotics unit but, rather, used these funds to pay general operating expenses and deficits.

21.    On June 10, 2004, roughly 60-days after Mr. Whitener made his initial investment of $50,000.00 in RPS, Mr. Weisenberg sent a letter to Mr. Whitener, announcing that he (Mr. Weisenberg) was making a "cash call" and that Mr.  Whitener's *pro rata* portion of the additional capital contribution is $12,500.00.  (Exhibit 9.)

**COUNT I**
**VIOLATION OF SECTION 10(b)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**
**AND**
**RULE 10b-5**

22.    Mr. Whitener  incorporates by reference paragraphs 1 through  21 of this complaint.

23.    In connection with the purchase or sale of 7.5% of the authorized membership interests in RPS to Mr. Whitener and an option to purchase an additional 2.5% of  the authorized interests in the company, Mr. Weisenberg and Mr. Davis, individually and

5

in their capacities as agents of RPS and TSI, made misrepresentations and misstatements of material facts, and failed to disclose material facts necessary, in order to make the statements made, in light of the circumstances under which they were made, not misleading.

24.     Mr. Weisenberg and Mr. Davis had access to RPS's books and records and/or were privy to RPS's negative net operating income and net income losses at the time that Mr. Whitener made an initial investment of $50,000.00 in RPS.  Mr. Weisenberg and Mr. Davis also knew that Mr. Whitener's investment would be insufficient to meet RPS's past due and current costs of operation (and a "cash call" would be necessary) and that the funds raised from the offer and sale of membership interest to Mr. Whitener would not be used for the stated purpose of completing a robotics unit.  In addition, Mr. Weisenberg represented that Mr. Whitener would be a managing member and would be expected and have the right to participate in the day-to-day management and affairs of RPS, when in fact Mr. Weisenberg and Mr. Davis had plenary control and authority over RPS and its business and operations to the exclusion of all others.  Despite this, neither Mr. Weisenberg nor Mr. Davis disclosed these material, nonpublic facts to Mr. Whitener at or before the time of the transaction, facts that any reasonably prudent investor would have viewed as being material to a decision whether to invest in RPS and its business venture with TSI.

25.     Mr. Whitener had no reason to question the integrity of the Defendants' statements and information, and justifiably relied to his detriment on the truthfulness, completeness, and accuracy of the Defendants' statements and information.

26.     Defendants, directly or indirectly, have violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 CFR § 240.10b-5, in that they knowingly or recklessly: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of a material fact or omitted to state a

6

material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud or deceit upon Mr. Whitener in connection with the purchase or sale of 7.5% of the authorized membership interests in RPS to Mr. Whitener and an option to purchase an additional 2.5% of the authorized interests in the company.

27.     As a direct and proximate result of the Defendants' untruths and omissions, Mr. Whitener purchased 7.5% of the authorized membership interests in RPS in exchange for $50,000.00 and incurred other damages as a result thereof, including making a partial payment of $3,456.26 towards the exercise price of the option, making an additional capital contribution of $4,500.00 pursuant to a "cash call," and miscellaneous other expenses he advanced on behalf of the company, and thereby has been damaged. Mr. Whitener is entitled to rescission of the membership interest transaction and a refund of the consideration he paid for those membership interests and the other expenses he incurred.

WHEREFORE, Mr. Whitener requests judgment in his favor and against the Defendants, jointly and severally, in an amount to be determined at trial, but believed to be in excess of $58,000.00, together with statutory interest, costs, and attorneys' fees.

**COUNT II**
**VIOLATION OF SECTIONS 517.07 AND 517.211**
**OF THE**
**FLORIDA SECURITIES AND INVESTOR PROTECTION ACT**

28.     Mr. Whitener incorporates by reference paragraphs 1 through 27 of this complaint.

29.     The RPS membership interests offered and sold to Mr. Whitener and the option to purchase additional membership interests in the company constitute "securities" under the Florida Securities and Investor Protection Act ("FSIPA"). FSA § 517.021(20).

30.     Defendants offered to sell, and sold, membership interests and an option to purchase additional membership interests in RPS to Mr. Whitener, a Florida resident, in violation of Section 517.07 of the FSIPA, being FSA § 517.07, in that the membership interests and the option (a) were not exempt from registration under Sec. 517.051 of FSIPA, being FSA § 517.051; (b) did not constitute a covered security under Section 18(b) of the Securities Act of 1933, as amended or rules and regulations adopted thereunder; and (c) were not registered under FSIPA.

31.     Mr. Whitener hereby tenders back his membership interests in RPS to RPS. Mr. Whitener is entitled to rescind the sale and to the return of the consideration he paid for the membership interests in RPS and an option to acquire additional interests in the company, plus all damages resulting from the sale, including the additional capital contribution and expenses he advanced on behalf of the company, together with statutory interest and attorneys' fees. FSA § 517.211.

WHEREFORE, Mr. Whitener requests judgment in his favor and against the Defendants, jointly and severally, in an amount to be determined at trial, but believed to be in excess of $58,000.00, together with statutory interest, costs, and attorneys' fees.

## COUNT III
## VIOLATION OF SECTIONS
## 517.301 AND 517.312
## OF THE
## FLORIDA SECURITIES AND INVESTOR PROTECTION ACT

32.     Mr. Whitener incorporates by reference paragraphs 1 through 31 of this complaint.

33.     The RPS membership interests offered and sold to Mr. Whitener and the option to purchase additional membership interests in the company constitute "securities" under the Florida Securities and Investor Protection Act ("FSIPA"). FSA § 517.021(20).

8

34.    In connection with the offer, sale, or purchase of membership interests in RPS and an option to acquire additional interests in the company, the Defendants, directly or indirectly: (a) employed a device, scheme, or artifice to defraud Mr. Whitener; (b) obtained money from Mr. Whitener by means untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, and a course of business which operated as a fraud or deceit upon Mr. Whitener, all in violation of Section 517.301 and 517.312 of the FSIPA.  FSA §§ 517.301 and 517.312.

35.    Pursuant to Section 517.312 of FSIPA, being FSA § 517.312, Mr. Whitener is entitled to rescind the transaction and recover damages as provided in Section 517.211, including statutory interest and attorneys' fees.   Mr. Whitener hereby tenders back his membership interest in RPS to RPS.

WHEREFORE, Mr. Whitener requests judgment in his favor and against the Defendants, jointly and severally, in an amount to be determined at trial, but believed to be in excess of $58,000.00, together with statutory interest, costs, and attorneys' fees.

## COUNT IV
## VIOLATION OF SECTIONS 301 AND 410(a)(1)
## OF THE MICHIGAN UNIFORM SECURITIES ACT

36.    Mr. Whitener incorporates by reference paragraphs 1 through 35 of this complaint.

37.    The "membership interests" and "option" offered and sold to Mr. Whitener constitute a "security" within the meaning of Section 401(z) of MUSA, being MCL § 451.801(z).

9

38.    The "membership interests" and "option" constitute a contractual or quasi contractual arrangement pursuant to which:

    a.    Mr. Whitener furnished capital to RPS.

    b.    A portion, if not all, of the capital furnished by Mr. Whitener was subjected to the risks of RPS's enterprise.

    c.    Mr. Whitener was induced to furnish capital to RPS by the representations of promoters, agents, and affiliates of RPS, including Mr. Weisenberg and Mr. Davis, individually and as agents of TSI, which gave rise to a reasonable understanding that a valuable and tangible benefit would accrue to Mr. Whitener as a result of the operation of RPS's enterprise.

    d.    Mr. Whitener, though he was named a managing member of RPS, did not get actively involved in the management of RPS, due Mr. Weisenberg and Mr. Davis's actions and omissions.

    e.    Defendants anticipated, at the time Mr. Whitener furnished capital to RPS, that financial gain may be realized as a result thereof.

39.    Defendants offered and sold securities to Mr. Whitener, in violation of Section 301 of MUSA, being MCL § 451.701, in that:

    a.    Defendants did not register the membership interests sold or the option granted to Mr. Whitener under MUSA;

    b.    The membership interests and option are not exempt from registration under Section 402 of MUSA, being MCL § 451.802, and

    c.    The membership interests and option are not a "federally covered security," in that they are not a "covered security" under the

Securities Act of 1933 or rules and regulations promulgated thereunder.

40.     In light of the foregoing violations of Section 301 of MUSA, Mr. Whitener hereby tenders back his membership interests in RPS to RPS and is entitled to rescind the transaction and obtain a full refund of the consideration he paid for 7.5% of the authorized membership interests in RPS, together with interest at the rate of 6% from the date the investment was made, costs, and attorney fees, pursuant to Section 410(a)(1) of MUSA. MCL § 451.810(a)(1).

41.     Each of the Defendants, directly or indirectly, controlled the seller of the membership interests and option to Mr. Whitener, or is a partner, officer, director, or seller, or occupied a similar status or performed similar functions, or was an employee of the seller who materially aided in the sale.  Therefore, pursuant to Section 410(B) of MUSA, the Defendants are  jointly and severally liable to Mr. Whitener for the full amount of Mr. Whitener's damages, interest, costs, and attorneys' fees.  MCL § 451.810(B).

42.     Mr. Whitener did not know, and in the exercise of reasonable care could not have known, of the existence of facts by reason of which liability is alleged to exist under MUSA.

WHEREFORE, Mr. Whitener requests judgment in his favor and against the Defendants, jointly and severally, in an amount to be determined at trial, but believed to be in excess of $58,000.00, together with statutory interest, costs, and attorneys' fees.

### COUNT V
### VIOLATION OF SECTION 410(a)(2)
### OF THE
### MICHIGAN UNIFORM SECURITIES ACT

43.     Mr. Whitener incorporates by reference paragraphs 1 through 42 of this complaint.

11

44.     Defendants offered or sold a security by means of untrue statements of a material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 410(a)(2) of MUSA, being MCL § 451.810(a)(2).

45.     Mr. Whitener did not know, and in the exercise of reasonable care could not have known, of the existence of facts by reason of which liability is alleged to exist under MUSA.

WHEREFORE, Mr. Whitener requests judgment in his favor and against the Defendants, jointly and severally, in an amount to be determined at trial, but believed to be in excess of $58,000.00, together with statutory interest, costs, and attorneys' fees.

## COUNT VI
## FRAUD

46.     Mr. Whitener incorporates by reference paragraphs 1 through 45 of this complaint.

47.     Defendants Mr. Weisenberg and Mr. Davis, individually and in their capacity as agents of RPS and TSI, made misrepresentations of material fact to Mr. Weisenberg in connection with an offering to sell or purchase membership interests and an option to acquire additional membership interests in RPS and failed to inform Mr. Whitener of material facts.

48.     Mr. Weisenberg and Mr. Davis knew or should have known of the falsity of their representations Mr. Whitener or the incompleteness of their statements to Mr. Whitener at the time these representations and statements were made.

49.     Mr. Weisenberg and Mr. Davis's misrepresentations, omissions, and concealment of material facts were made intentionally or recklessly for the purpose of inducing Mr. Whitener to purchase 7.5% of the membership interests in RPS and to

12

purchase additional membership interests, and were made with reckless and utter disregard as to their truthfulness or completeness.

50.     Mr. Whitener reasonably and justifiably relied to his detriment on the truthfulness of Defendants' representation and on the completeness of their disclosures of material facts, and Mr. Whitener thereby was induced to purchase 7.5% of the membership interests in RPS for $50,000.00. But for Defendants' misrepresentations, omissions, and concealment of material facts concerning the offering to sell or purchase membership interests in RPS, Mr. Whitener would not have entered into the transaction.

WHEREFORE, Mr. Whitener requests judgment in his favor and against the Defendants, jointly and severally, in an amount to be determined at trial, but believed to be in excess of $58,000.00, together with statutory interest, costs, and attorneys' fees.

## COUNT VII
## NEGLIGENT MISREPRESENTATION

51.     Mr. Whitener incorporates by reference paragraphs 1 through of this complaint.

52.     Defendants induced Mr. Whitener to purchase 7.5% of the membership interests in RPS for $50,000.00 on the basis of false or incomplete information which the Defendants negligently provided to Mr. Whitener.

53.     Defendants should have known, through the exercise of ordinary and reasonably care, that the information and representations that they provided to Mr. Whitener regarding the offering to sell or purchase membership interests in RPS, were material and false, misleading, and incomplete.  Defendants had a duty to ensure that the information they furnished to Mr. Whitener was truthful, accurate, and complete and to make additional disclosures in order to make untruthful and incomplete disclosures truthful and complete.

13

54.    Mr. Whitener reasonably and justifiably relied to his detriment on the truthfulness, completeness, and accuracy of Defendants' representations and the information they furnished to him and thereby was induced to purchase 7.5% of the authorized membership interests in RPS.   As a direct and proximate result of Defendants' misrepresentations and their furnishing of false, incomplete, and inaccurate information to Mr. Whitener, Mr. Whitener has been damaged to the extent that he purchased 7.5% of the membership interests in RPS and incurred other expenses, a transaction to which he would not have entered but for the Defendants' misrepresentations and omissions of material facts. Mr. Whitener is entitled to rescission of the transaction and to refund of the consideration he paid for 7.5% of the membership interests in RPS and the expenses he advanced to RPS.

WHEREFORE, Mr. Whitener requests judgment in his favor and against the Defendants, jointly and severally, in an amount to be determined at trial, but believed to be in excess of $58,000.00, together with statutory interest, costs, and attorneys' fees.

### COUNT VII
### VIOLATION OF SECTION 515
### OF THE
### MICHIGAN LIMITED LIABILITY COMPANY ACT

55.    Mr. Whitener incorporates by reference paragraphs 1 through 54 of this complaint.

56.    Mr. Weisenberg, both as a managing member and a member holding a majority of the membership interests in RPS, controls the company.  Mr. Weisenberg in fact has represented to Mr. Whitener, orally and in writing, that, despite Mr. Whitener holding a nominal title as a "managing member," he does not have the right to participate in running or controlling the company, Mr. Weisenberg, and Mr. Weisenberg alone does.

14

57.     The managing members and members of RPS have held formal and informal meetings about or concerning RPS and its business affairs and operations, to the exclusion of Mr. Whitener, and Mr. Whitener has been "squeezed out" of all matters involving the company.

58.     Mr. Weisenberg runs RPS as his own fiefdom, and does not share, furnish, or exchange internal, nonpublic information about or concerning RPS and its business affairs and operations, including expenses the company pays for Mr. Weisenberrg's benefit, with Mr. Whitener.

59.     Mr. Weisenberg's actions are illegal, fraudulent, and constitute willfully and unfair and oppressive conduct toward RPS and its other members, including Mr. Whitener. Mr. Weisenberg has engaged in significant action or a series of actions that substantially interferes with Mr. Whitener's interests as a member of RPS.

60.     Pursuant to Sec. 515 of the Michigan Limited Liability Company Act, being MCL § 450.4515, this Court has the authority to, among other things, order:   (a) the dissolution and liquidation of the assets and business of RPS; (b) the purchase at fair market value of Mr. Whitener's interests in RPS, either by RPS or Mr. Weisenberg personally; and/or (c) award damages to Mr. Whitener.

WHEREFORE, Mr. Whitener requests all or part of the  relief set forth in Sec. 515 of the Michigan Limited Liability Company Act, being MCL § 450.4515, including that judgment be rendered in his favor and against Defendants in an amount to be determined at trial but believed to be in excess of $58,000.00, together with interests, costs, and attorneys' fees.

## COUNT VII
## CIVIL CONSPIRACY

61.     Mr. Whitener incorporates by reference paragraphs 1 through 60 of this complaint.

62.     Defendants conspired, confederated, and acted in concert to achieve an illegal purpose or used illegal means towards immoral and unjustifiable ends, including, but not limited to, making false and misleading representations to Mr. Whitener to induce him to purchase 7.5% of the membership interests in RPS, and usurping all control of RPS and thereby squeezing out Mr. Whitener from the company and its business and operations.

63.     Mr. Weisenberg, as a managing member of RPS, owed a fiduciary duty to Mr. Whitener and others who held membership interests in the company, and breached that duty on multiple levels. Mr. Davis and  TSI joined in a plan or scheme which necessarily involved and entailed Mr. Weisenberg breaching his fiduciary duty to Mr. Whitener and, as a result thereof, Mr. Davis and TSI arte liable for the breach of duty to the same extent as Mr. Weisenberg.

64.     As a direct and proximate result of the  foregoing conspiracy, Mr. Whitener has suffered damages.

WHEREFORE, Mr. Whitener requests judgment in his favor and against the Defendants, jointly and severally, in an amount to be determined at trial, but believed to be in excess of $58,000.00, together with statutory interest, costs, and attorneys' fees.

Respectfully submitted,

By: Dean J. Groulx (P51262)
Hyman Lippitt, P.C.
322 N. Old Woodward
Birmingham, Mi 48009
(248) 646-8292
Counsel for Plaintiff

David S. Mendelson (P53572)
Law Offices of Davis S. Mendelson, P.C.
322 N. Old Woodward
Birmingham, Mi 48009
(248) 646-8277
Co-counsel for Plaintiff

Dated: December 17, 2004

# ORIGINAL

**FILED**

U.S. DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
~~NORTHERN~~ DIVISION
*Southern*

**JAN 13 2005**

**U.S. DISTRICT COURT
FLINT, MICHIGAN**

MICHAEL WHITENER, a
Florida resident,

      Plaintiff,

- vs -

ROBOTIC PIPELINE SOLUTIONS,
L.L.C., a Michigan limited liability company,
KENT WEISENBERRG, a Michigan resident,
TRU-SEAL, INC., an unincorporated business
association now operating as TRU-SEAL, L.L.C.,
a Michigan limited liability company, and
THOMAS DAVIS, a Michigan resident,

      Defendants.

_____/

**05 - 70137**

**LAWRENCE P. ZATKOFF**

**VIRGINIA M. MORGAN**

HYMAN LIPPITT, P.C.
Dean J. Groulx (P51262)
322 N. Old Woodward
Birmingham, Mi 48009
(248) 646-8292
Counsel for Plaintiff

LAW OFFICES OF DAVID S. MENDELSON, P.C.
David S. Mendelson (P53572)
322 N. Old Woodward
Birmingham, Mi 48009
(248) 646-8277
Co-counsel for Plaintiff

## EXHIBIT BOOK TO
## PLAINTIFF'S COMPLAINT



# Tru–Seal, Inc

*In-situ structural remediation of Pipeline*

# Marketing Plan

# March 2004

PIPE  LINING

**Mission Statement**: To utilize sprayed in place pipe technology to
become the premier provider of in-situ pipeline remediation
to preserve the life of pipeline infrastructure worldwide

COPY NO. 5

Tru-Seal, Inc          March 2004          

## Table of Contents

*Investment Highlights* _____ 1

*Executive Summary* _____ 2

*Technology* _____ 7

*Market Analysis* _____ 10

   Market Overview _____ 10

   Market Size _____ 13

   Market Segmentation _____ 15

   Public Sector _____ 16

   Private Sector _____ 17

   Market Entry _____ 19

*Competitive Analysis* _____ 21

   Competing Technologies _____ 21

   Competing Companies _____ 22

   Cost Comparison _____ 23

*Marketing Plan* _____ 26

   Value Proposition _____ 26

*Operations Plan* _____ 29

   Phase I – Introduction _____ 29

   Phase II - Commercialization _____ 31

   Phase III – Rapid Growth _____ 32

*Management Summary* _____ 32

   Personnel _____ 32

   Financial Plan _____ 35

   Cost Analysis for SIPP™ Application _____ 35

   Income Assumptions _____ 36

*Appendix I : Bid document Comparisons* _____ 40

*Appendix II:  Market survey Information* _____ 49

*Appendix III:  Sample Market Data* _____ 51

*Appendix IV:  Commendation Letter for Completed Job* _____ 54

CONFIDENTIAL                                          Index

Tru-Seal, Inc                     March 2004                        

# Investment Highlights

Tru-Seal is in the process of finalizing first mobile equipment to enable commercial roll-out of a unique product and process for the in-situ remediation of pipeline, using proprietary and patent pending technology. The highlights of this marketing opportunity are as follows:

- **Market:** An extremely large market that is on the "cusp of exponential growth" and is truly worldwide. The market includes sewage lines (our point of entry), drinking water pipelines, Oil & Gas transmission lines and industrial process lines.

- **Barrier to competitors entry:** Patent pending application equipment, methods and chemical formulation technology creating a significant window of time to capture market share

- **Acceptance of in-situ remediation:** 30 year old technology utilized by competitors has successfully introduced the market to in-situ techniques versus excavation.

- **Government pressure to deal with aging infrastructure:** Recent and pending changes in Government Accounting Standards Board regulations highlight infrastructure conditions and will spur growth of remediation industry

- **Management:** Highly experienced, knowledgeable senior management team

- **Fundamental R&D complete:** Process is ready for initial commercialization

- **Small market share equals strong growth:** Projected 2006 revenues in excess of $5 million under conservative market penetration forecasts.

- **Potential to achieve rapid growth with prudent marketing.**



Tru-Seal, Inc                           March 2004

# Executive Summary

Tru-Seal, Inc has formed to combine certain intellectual property, research, engineering and assets to create a new venture focused on the implementation of proprietary technology to remediate buried pipelines, in-situ as well as lining new pipe joints. Several formulas, each polyurea derivatives, are applied via a remote robotic system to mold a surrogate pipe within the existing incumbent pipe. One of the formulations ("TRU-SEAL >> STRUCTURAL", hereinafter "*Structural*") exhibits a very high flexural modulus and thereby gives renewed structural integrity and eliminates fluid inflow and infiltration. This process is quicker and cheaper than current techniques, and creates almost no surface disruption, unlike traditional methods of pipeline excavation and replacement.

Tru-Seal is seeking Licensees to purchase equipment, train personnel and to implement the technology on a commercial basis. The marketing plan projects growth based upon licensee levels..

The financial projections demonstrate potential first year breakeven, and assume an aggregate modest market penetration of less than 0.5% of the US projected market for (only) wastewater pipelines in 2006 to 2007.

**Thomas (Tom) Davis**, President, has 40 years of experience as an engineer/chemist and has been involved in polyurea formulation since its invention. Tom has successfully patented formulations of polyurea such as Warrior, a highly chemical resistant polyurea. He additionally created the first single component polyurea and is recognized as one of the leading chemists in the field.

**Kent Weisenberg**, Vice-President, has 15 years of project experience in remediation of waste-water pipe and manholes and has owned and operated a service company in the business for the past 7 years. He has personally been responsible for the successful engineering application of over a million square feet of polyurea systems.

Kent and Tom are responsible for the design and development and patenting of the robotic spray applicator and associated plugger device that are key elements of the marketing process.



Tru-Seal, Inc                 **March 2004**

A 2002 study of the US infrastructure needs by the Environmental Protection Agency confirmed that the buried transmission and distribution pipeline system is in imminent and extensive need of rehabilitation. As the infrastructure reaches the end of its 75 year design life, renovation and replacement industries servicing this need have been growing. Currently $3.5 billion per annum is spent in the U.S. on pipeline renovation. Considering that the US has 600,000 miles of waste water pipeline, renovation of just 1% of this pipeline per year would translate into a $10 billion market. The urgency of the need for renovation must drive significant growth in this field.

The market in the U.S. is large, but is estimated to be only one sixth of the size of the international market, much of which is even further down the decay curve. Furthermore, water pipeline, oil and gas transmission lines represent even greater opportunities as the technology is developed. In total, the global market may be estimated at around $50 billion.

Pressure from both the Environmental Protection Agency (EPA) and the Government Accounting Standards Board (GASB) is growing which will result in an accelerated rate of remediation of failing infrastructure. Significantly, a recent ruling by GASB requires that utilities account for infrastructure in the same way as private enterprise. Implementation of GASB 34 is to be phased in depending upon the size of the utility. Thus, by June 2005 the largest utilities will begin to be financially accountable, and by 2007, all U.S. utilities will be accountable for the condition of their pipes. This will have wide ranging impact from affecting the cost of capital (bond issues) to the visibility of neglected systems. As cities are budget constrained, there is always more work pending than funds available. This leads to a strong demand for low cost solutions (more pipeline will be remediated for the same money).

The cost of pipeline remediation is not just measured by the direct cost of the intervention, but additionally by indirect economic impact of disrupted traffic and other services, and the consequent cost to business. In fact, it is estimated that this economic impact is up to twice as expensive as the actual remediation.

For the past 20 years, industry has worked to develop remediation techniques that do not require digging up pipelines, and therefore avoid much of the direct impact and cost of a remediation project. Basically, these techniques consist of inserting a pre-constructed pipe into the existing pipe using manholes, or enlarged manholes as access points. This 'trenchless technology' industry is rapidly growing.

2:05-cv-70137-LPZ-VMM Doc # 1 Filed 01/13/05 Pg 26 of 50 Pg ID 76



In 1988, Texaco developed a 100% solids Polyurea system that can be applied by spray gun. The product has some remarkable qualities: It cures in seconds, and is largely unaffected by humidity and moisture; It has extremely high abrasion resistance, mechanical strength and stability; It is highly resistant to chemicals and UV light, and with correct surface preparation it will adhere to almost anything, concrete and steel in particular. Polyurea finds application in many industries, for example; tank lining, truck bed lining, and roof coatings. Polyurea has been used to coat the Trans-Alaska pipeline to protect it from corrosion and external impact.

Current technologies in trenchless remediation of pipelines have significant deficiencies. In particular, the failure to eliminate inflow and infiltration due to the formation of annular spaces between the surrogate pipe and the host pipe occasionally requires manual repair. Repairs of this type have been made using epoxy, polyurethane, and more recently polyurea which, due to its fast cure and stability, has become more prevalent.

The culmination of three years of research and development work by Weisenberg and Davis, Tru-Seal has combined patent pending high flex mod polyurea (*Structural*), with a patent pending robotic applicator that is capable of entering pipelines as small as 8 inches diameter, and applying sufficient thickness of the *Structural* to achieve structural remediation of the host pipe (ASTM F 1216). Effectively the host pipe serves as a molding tool for the new pipe lining.

The Tru-Seal *Structural* high modulus polyurea process exhibits both cost and quality advantages. Analysis indicates that the process is approximately 20% cheaper than the leading competitor technology, while creating a superior remediation that eliminates all inflow and infiltration, has no annulus problems, and includes an important 'grouting' step that stabilizes the host pipe in the ground environment.

███████████████████████████████████

Tru-Seal will develop licensees nationwide to exploit the opportunity created by this proprietary technology in the growing pipe-line remediation market. International opportunity will be pursued with strategic partnerships.

Licensing terms and conditions are contained in documentation separate from this plan.



# Industry Background

*Our streets aren't so much streets any more as a series of road excavations, forming a giant, perpetual work in progress. The streets, the arteries of our collective body, are riddled with holes, and the consequences of this are far-reaching. Noise, pollution and ugliness pervade; business and social life is restrained; everyday activity becomes an assault course; pedestrians, cyclists, buses and emergency services are thrown into confusion; traffic goes haywire and everyone goes livid[1]*

Pipeline infrastructure systems worldwide are starting to fail with increasing regularity. Over the last century, various support systems providing essential services such as the delivery and collection of water and waste-water have been developed. These pipelines have been buried under progressively growing surface infrastructure, and are now rapidly reaching the end of their design lives. Conventional repair or replacement of such systems results in significant disruption of surface facilities, such as road and buildings. This problem is even more pertinent in Europe where excavation of buried pipelines often encroaches on historic buildings and access is complicated by lack of space.

The 'Trenchless Technology' industry came to prominence in the '70s when a British company invented a technique called 'Cured In Place Pipe' (CIPP). CIPP was the first technology to enable the remediation of pipelines without excavation, thus avoiding most surface disruption and destruction associated with pipeline remediation.

Trenchless remediation is rapidly becoming a preferred solution; not having to excavate saves money (trenchless remediation is estimated to be from 25% to 35% of the cost of excavation methods), takes less time, creates far fewer community hazards such as traffic delays, and may significantly reduce indirect economic costs such as the impact on local businesses. Consequently, trenchless remediation is growing its market share (currently estimated to be 35% of total remediation market), in a rapidly growing market.

CIPP was followed by techniques such as sliplining, fold and form, pipebursting and others; however the basic premise of *all* current structural remediation techniques is to use manholes (or excavated access pits) as access points, and to insert a pre-constructed pipe (or fabric) into the existing 'host' pipe. Robots are then used to cut through for lateral pipes (for instance those servicing individual households), and the result is a full service replacement structural system.

All such in-situ remediation systems suffer from a problem inherent in their installation: as the surrogate pipe is pre-formed and then inserted, there are limits to its ability to adapt to shape and surface irregularities of the host pipe. Additionally, where heat is involved for curing (CIPP), an annulus is formed between the new and old pipes because the new

---

[1] Guardian Newspaper, October 2002, UK.

Tru-Seal, Inc                      March 2004                      

pipe shrinks as it cools, enabling fluid communication between leaks (this annulus is formed in the majority of CIPP installations due in part to the pipe's pre-formed 'rigid' nature). This is a major inadequacy of current technologies and is particularly important where waste-water leakages may seep into water tables or other transmission systems, or where there is a large cost of treating ground water infiltrations at waste water treatment plants.

Tru-Seal has developed a completely new approach to trenchless remediation: Sprayed In Place Pipe (SIPP™) actually creates a new structural pipe within the existing pipe, using the original, or 'host' pipe as a mold. In this way, compromises of the current processes are avoided: SIPP™ forms a pipe exactly the shape of the host pipe, regardless of oval effects and minor intrusions, leaving no possibility of annulus communication; laterals become part of the system instead of having to be re-opened by cutting; the system is fully adaptable to any internal diameter, obviating the need for custom 'just in time' preparation of insertion pipe fabric that reduces flexibility and complicates operational logistics for incumbent technologies.

Furthermore, since the new pipe is formed remotely, the use of umbilical hoses enables the surface equipment to be placed in the most convenient place for the environment, not necessarily requiring the direct location above a man-hole, thereby minimizing the footprint of the operation. This significantly reduces community disruption (frequently man-hole access points may be in a back yard), lessening the cost and the inconvenience.



SIPPS ROBOTIC SPRAYER

CONFIDENTIAL



Tru-Seal, Inc                    March 2004

# Technology

In the early 1980's, Texaco Chemical's Austin Research Laboratories developed a polyurea reaction injection molding (RIM) for automotive exterior body panel applications, and in 1988 introduced the 100% solids polyurea spray elastomer coating. Polyurea technology combines ultra fast curing (as low as 3 seconds), even at low temperatures, and water insensitivity with exceptional mechanical properties, chemical resistance and durability.

Polyurea coating is the result of a one-step reaction between an isocyanate quasi-prepolymer component and an amine blend component. The basic reaction is:

$$R-NCO + R^1 NH_2 \implies RNH-CO-NH-R$$
Isocyanate    Amine                    Polyurea

Polyurea's exceptional properties[2] and fast cure time have made it an important coating in situations where a quick turn-around time is critical, for instance it is frequently used to protect the exterior of iron pipelines during installation processes. Many pipelines around the world, including the Trans-Alaska Pipeline, have used this technology to speed production and minimize maintenance costs. Additionally, polyurea[3] is already used as a liner for the inside of manholes during remediation work.

Polyurea is considered so important, that in 2000, the Polyurea Development Association was formed to advance its use and science.

Tru-Seal has developed two **patent pending** derivative formulations of polyurea, *Structural* and WARRIOR™ that exhibit significantly improved properties over generic polyurea blends:

- Higher tensile strength, higher flexural modulus( *Structural*)
- Long term stability, highly resistant to chemicals (acid, alkali, water)
- Extremely high abrasion resistance
- Fast reaction time – Gel, or cure time, is 4-7 seconds and can be controlled by formulation,
- They can be applied over cold or damp surfaces and are largely unaffected by humidity, and surface moisture.
- Adhesion – given proper surface preparation, they adhere to most surfaces, including concrete and steel.

---

[2] For a full discussion of the chemistry and properties of Polyurea, refer to "Polyurea Spray Coatings, The technology and latest developments" by Marc Broekaert, Huntsman Polyurethanes.
[3] Standard polyurea's are used commercially for roof coatings, pipe protection (external), tank coatings, truck bed liners etc. In 2001, an estimated 25 million lbs was sold, with a value of around $70 Million.



Tru-Seal, Inc                    March 2004

- No volatile content – They are 100% solids system, there are minimal fumes or emissions
- Heat and fire resistant

These properties make the high flex-mod *Structural* ideal for the structural remediation of pipelines. However, prior to Tru-Seal, polyureas have been applied via manual spray guns, and for pipelines less than 48" in diameter, this is clearly impractical or impossible.

Tru-Seal is the exclusive licensee of a special robotic applicator (RotoSpray™, patent pending), developed to run on an umbilical controlled from the surface, which enables access to pipelines of any diameter (current minimum is 8"). In order to create an internal pipe lining of *Structural* of sufficient thickness for structural strength, a layer of between 4mm and 30mm is required depending upon pipe diameter and design criteria. RotoSpray™ utilizes a number of innovative patent pending features in order to achieve this whilst traversing the pipeline.

RotoSpray™ operates in multiple pipe diameters.   By reconfiguring the transport mechanism to centralize the spray head, RoboSpray™ handles any size, currently from 8" to 48".

A companion device, the Plugger, is used to enter into the pipeline prior to RotoSpray™. The Plugger uses CCTV to view the condition of the pipe interior, and to place a rubber bladder 6 inch diameter (or as required) inside each lateral.  The bladder expands and seals the lateral against 'accidental' use of home plumbing (such as flushing) during the operation.  The bladder auto-deflates after a several hours, and drops into the wastewater system, re-opening the household outlet.

The combination of *Structural* and RotoSpray™ enables a unique approach to in-situ remediation of pipeline, termed Sealed In Place Pipe (SIPP™).

*Structural* exhibits superior physical properties to other trenchless remedial materials:



| | | | | | |
|---|---|---|---|---|---|
| D 790 | D 638 | D 790, D 638 | D 638 | D 790 |
| 250,000 psi | 350,000 psi | 136,000 psi | 133,000 psi | >300,000 psi |

---

[4] Flexural Modulus is a measure of the physical strength of the material – (the ratio, within the elastic limit, of the applied stress on a test specimen in flexure, to the corresponding strain in the outermost fibers of the specimen).  It can be used in calculations (modified Timoshenko equation) to determine the required thickness of the lining to provide structural support.  250,000 psi is considered the minimum suitable for structural remediation of pipe (ASTM F-1216).

CONFIDENTIAL

Tru-Seal, Inc                        March 2004                        

| | 4,500 psi | 6,000 psi | 3,200 psi | 3,500 psi | >6,000 psi |
|---|---|---|---|---|---|

* Note: Sliplining is not a true trenchless technology. Significant excavation is required to create sufficiently large access to insert 'rigid' liner pipe.

---

[5] Tensile strength is the ability of a material to withstand tensile loads without rupture when the material is in tension.

CONFIDENTIAL

Tru-Seal, Inc                         March 2004                         

# Market Analysis

## Market Overview

Clean, safe drinking water is a luxury enjoyed by everyone in the United States, so is the ability to flush waste water into a system that removes, treats and returns the fluid to the eco-system, protecting from the spread of disease and without harming society. These little-considered services are enabled by a vast network of pipelines, in large part buried beneath the surface, that collect or distribute at the home and transport to central treatment facilities. These pipelines have a finite lifespan. The corrosive nature of their environment and the fluids they transport, the ground stability and other factors all work together to cause gradual reduction in physical integrity until they fail.

The USA has 600,000[6] miles of wastewater pipeline, and 2,000,000[7] miles of drinking water pipeline. The oldest installations of these date back 200 years, but, according to the EPA, "the vast majority of the nation's pipe network was installed after the 2[nd] World War, and the first part of this wave of pipe installation is now reaching the end of its useful life. For this reason, even if the pipe system is extended to serve growth, and the country invests in the replacement of all pipe as it comes to the end of its useful life, the average age of pipe in the system will still increase until 2050"[8]

---

[6] There is no actual inventory of total sewer pipeline associated with waste water collection systems in the USA. The American Society of Civil Engineers (ASCE) has developed an estimate based on feet of sewer per capita.
[7] 1995 Community Water System Survey (CWWA) estimates 2 million miles of pipe inventory currently in place.
[8] United States Environmental Protection Agency; 2002 Clean Water and Drinking Water Infrastructure Gap Analysis

Tru-Seal, Inc                    March 2004                    



Furthermore, the average lifespan of infrastructure pipeline has decreased. The oldest cast iron pipes, dating back to the late 1800's, have a life expectancy of 120 years. Because of changing materials and manufacturing techniques, pipes laid in the 1920's have a life expectancy of 100 years, and the pipes laid during post WWII boom are expected to last 75 years[9]. If we assume that the decay of pipeline integrity follows a normal distribution model around these mean lifespan expectancies, and plot the number of miles reaching the end of their useful life in each period, the resulting cumulative distribution clearly demonstrates that we are entering the leading edge of a convergence of end-of-life expectation of the majority of installed systems.

---

[9] American Water Works Association - Re-investing in Drinking Water Infrastructure; Dawn of the Replacement Era.

CONFIDENTIAL                                                    Page 11



Tru-Seal, Inc                          March 2004



Chart developed by Tru-Seal analysis of EPA Clean Water and Drinking Gap Analysis

As pipe assets age, they tend to break more frequently, but it is usually not cost effective to replace pipes immediately. Thus remediation and repair would be anticipated to grow in advance of the end of life of these assets, as utilities and other inventory owners attempt to maximize the useful life of the original infrastructure. It is estimated that in 1980, approximately 10% of sewer pipes were in need of renovation, as indicated by a rating of poor, very poor, or elapsed life. Currently this figure is 23% and is estimated to grow to 45% by 2020[10] (see chart on next page).

"Water Industry authorities and analysts believe that maintaining the nation's high-quality drinking and wastewater services will require a substantial increase in spending over the next two decades. They point to many types of problems with existing water infrastructure, including the collapsed storm sewers in various cities, the 1.2 trillion gallons of water that overflows every year from sewer systems that commingle stormwater and wastewater, and the estimated 20% loss from leakage in many drinking water systems."[11]

---

[10] United States Environmental Protection Agency; 2002 Clean Water and Drinking Water Infrastructure Gap Analysis
[11] CBO "Future Investment in Drinking Water and Wastewater Infrastructure", Nov 2002

CONFIDENTIAL                                              Page 12



Tru-Seal, Inc                          March 2004



Chart developed from analysis of EPA Clean Water and Drinking Water Gap Analysis

The imperative to act on maintenance of these systems is clear, beyond practical matters, *"a problem with the water or sewer pipes is the type of publicity that a politician doesn't want on the 6 o'clock news"*. More tangibly, the Government Accounting Standards Board (GASB) says state and local governments should report their financial health as though they are private sector organizations and this includes accounting for all their capital assets. These assets need to be inventoried and some value attached to them[12]. This requires making an assessment of the condition of pipelines in order to assign a value. Implementation of GASB 34 is to be phased in depending upon size, thus by June 2005, the largest utilities will begin to be financially accountable, and by 2007, all utilities will be accountable for the condition of their pipes.

## Market Size



Chart developed from multiple sources

---

[12] Statement No. 34 - Managements Discussion and Analysis – for State and Local Governments (GASB 34)



Tru-Seal, Inc                            March 2004

Tru-Seal's strategy proposes market entry in the waste water pipeline sector and subsequent expansion into fresh water, Oil and Gas transmission lines and chemical process lines. The following analysis is limited to the domestic U.S. waste water pipeline industry only, which can be approximated as 4% of the worldwide pipeline market.

For the 6th Underground Construction / Rehabilitation Technology magazine municipal sewer and water survey (2003), 7900 municipalities were surveyed to analyze their infrastructure spend. The survey concluded that

- Overall spending for sewer / water construction / rehabilitation was expected to increase from $11.3 Billion in 2002 to $11.9 Billion in 2003.
- Total rehabilitation spending is expected to increase by a factor of 7.6% to $3.5 Billion, of which, sewer rehabilitation is expected to be $2.1 Billion.
- All spending plans were impacted by well-publicized municipal budget shortfalls which required managers to minimize anticipated costs.

The survey also tried to gain qualitative indications as to the prevalence, or market penetration, of trenchless technology, since its introduction 25 years ago. Estimates currently consider that about 35% of the market is performed without excavation, but traditional 'exhume and replace' is still widely used. In large part this appears to be due to a lack of awareness, or lack of availability of trenchless pipe renovation capacity, and only occasionally due to no viable trenchless alternative. The Survey found that 55.8% of respondents had used various trenchless methods within their cities, and of those who had not, 28.2% said they are planning to try trenchless technologies during 2003, and 44.8% said that they would try trenchless within 5 years.

Trenchless sewer projects tend to be only 25% of the cost of 'exhume and replace' projects[13], and it is estimated that 75% of all sewer projects could be performed without excavation. It is probable that the increasing miles of pipeline nearing the end of their useful life and requiring remediation, compounded by the increase in market penetration of trenchless methods will cause a significant increase in the demand for Tru-Seal capability. In fact, Underground Construction magazine calculates that the trenchless pipe renovation market is growing at a CAGR of 29% since 2000, and industry expert Grant Whittle comments that "Trenchless pipe renovation appears to be on the cusp of exponential market growth[14]".

Various analyses exist as to the total cost of maintaining the wastewater infrastructure over the next 20 to 30 years. While absolute dollar amounts vary, all studies agree that there needs to be rapid growth in expenditure in order to prevent catastrophic failure of our infrastructure.

---

[13] Expanding Opportunities in the US Water and Sewer Pipe Renovation Industry, G. Whittle.
[14] Expanding Opportunities in the US Water and Sewer Pipe Renovation Industry, G. Whittle



Tru-Seal, Inc                          March 2004

- If it is assumed that the average lifespan of pipeline installed is 100 years, it is reasonable to assume that 1% should be replaced per year. This equates to 6,000 miles or 32,000,000 feet; at an average cost of $300 per ft (conservative estimate, assuming 25% trenchless remediation, 75% replacement, mix of pipe sizes) this implies a required expenditure of $10 billion annually. This figure only considers renovation, not new construction.
- The American Water Works Association calculates, by extrapolation of a study based on 20 Cities[15], that spending on water pipelines and associated equipment will need to triple over the next 25 years.
- The EPA Gap analysis[16] indicates the need for an annual $8.9 billion expenditure on sewer pipe renovation, which can be compared with current $2.1 billion[17] and implies a 420% increase.
- The Congressional Budget Office (CBO) estimates that for 2000 to 2019, annual costs for investment will be between $13 billion and $21[18] billion for wastewater systems. Additionally, annual costs for operations and maintenance (O&M) will be between $20 billion and $25 billion.

Locally, in June of 2002, the Houston Chronicle reported that Jon C. Vanden Bosch, Houston Public Works Director stated "a crisis is looming because the city has neglected its $6.6 Billion water and sewer system. The city is spending only one fifth of necessary money to replace crumbling pipes and plants". These statements came after Houston had already completed an EPA mandated 10 year sewer renovation program. These spending shortfalls only compound the underlying problem.

These compelling trends clearly indicate the market opportunity for Tru-Seal's low cost high quality pipeline remediation solution is enormous.


## *Market Segmentation*

The market can be segmented into several distinct categories, each with unique characteristics and therefore differing requirements from Tru-Seal. Note that internationally, the same situation exists, although anecdotally it is understood that European infrastructure is in a more dangerous position with respect to pending failure, as, in general, pipelines were installed earlier and the cities and surrounding areas are more highly developed and historic and therefore harder to justify excavating.

---

[15] Dawn of the Replacement Era – American Water Works Association
[16] Environmental Protection Agency Sept 2002 paper "The Clean Water and Drinking Water Infrastructure Gap Analyis
[17] 6th Underground Construction / Rehabilitation Technology municipal sewer and water survey (2003)
[18] CBO "Future Investment in Drinking Water and Wastewater Infrastructure", Nov 2002.

Tru-Seal, Inc                          March 2004                    

| Category | Miles Installed |
|---|---|
| US Sanitary Sewers | 600,000 |
| US Drinking Water | 2,000,000 |
| US Gas Transmission[19] | 244,000 |
| US Oil Transmission[20] | 154,000 |
| Europe Wastewater | 1,200,000 |

**Wastewater**:   Generally gravity feed, low / no pressure.   Somewhat acidic (H2S). Requires certification to ASTM standard. The waste water infrastructure is characterized by manholes, serving as open access points between 250 and 300 ft apart

**Drinking Water:** Requires conformance to standards associated with potable water. Fewer access points, some valves, junctions.  In some cases access will need to be created through point excavation.

**Gas Transmission**:   Higher pressure, up to 1200psi.   Flow characteristics / friction important to improve volume.  Resistance to corrosive fluids 'falling out' of gas, settling in low spots.  Access governed by valves which tend to be reasonably frequent to enable shut down and isolation in the event of failures.

**Oil Transmission**:  More corrosive environment.  Access governed by valves which tend to be reasonably frequent to enable shut down and isolation in the event of failures

The target sector for market penetration is the public sector and private sector wastewater pipeline market.


## *Public Sector*

In order to gain pre-approval for public sector work, certain milestones must be achieved. Any new product must pass a series of tests for acceptance in remediation work.  In order to expedite approval, Tru-Seal has chosen to apply for approval under the code already established for liners; Cured in Place Pipe (CIPP) application.  The City of Houston ("COH") specification (section 02765) has established parameters around tests according to ASTM C 581 and ASTM D 790, and there are recognized protocols:  COH specification (section 02765) has established procedures to evaluate the chemical resistance, and flexural properties of the material.  The procedure is as follows:

i)      Material submitted for test at approved lab
ii)     Test results are passed to the 'New Products Committee" for confirmation

---

[19] National Pipeline Mapping System, US D.o.T. (excludes local distribution systems)
[20] National Pipeline Mapping System, US D.o.T. (excludes local distribution systems)

CONFIDENTIAL



iii)    Demonstration job is performed and evaluated after a 6 month interval.
iv)    Material is accepted / rejected for use for structural remediation application

Once approval is obtained, the material can be bid against any CIPP remediation project. However, in Municipal Utility Districts, (MUD's) repairs and maintenance do not require pre-approval from the City of Houston through Products Review

Tru-Seal has received a proposal from Dr. Vipulanandan, ("Dr. Vipu") of the University of Houston, for the testing of *Structural*[21]. Dr. Vipu is one of the country's foremost experts in pipeline remediation, and is recognized by the City of Houston as being the most competent expert for this procedure. An element of this test is a one year exposure to sulphuric acid (pH 0.5) and alkali (pH 11) to determine long term effects of exposure to various chemicals. Tru-Seal has additionally commissioned Dr. Vipu to design an accelerated, one month test that simulates chemical aging and enables extrapolation of test results to demonstrate behavior under long term exposure. The results of such an accelerated test as sanctioned by Dr. Vipu' is anticipated to be a sufficient substitute for full, one-year testing.[22]

Public sector pipeline remediation work is specified and bid out by engineering contractors. Once a material has City approval, as an equivalent material, the engineering contractor is obligated to review bids received and award the work to the lowest bidder, provided the bid is deemed reasonable and adequate by the engineers. The lowest bid must be qualified by a consulting engineer and/or municipal board.

## Private Sector

Of the estimated 42,500 waste-water lines in the US, 23,000 of these are privately owned, by companies such as large manufacturing plants etc.

Where publicly owned infrastructure authorities may defer O&M spending to a limited extent, the private sector has a more tightly controlled environment. With the prospects of litigation in the event of any contamination, it is prudent for owners of waste water lines to ensure that these are well maintained. For instance, leakages seeping into the water table could result in significant liability. Tru-Seal has previously completed pipeline remediation for a major automotive manufacturer in the Detroit area. According to an independent project overview and cost analysis by In-Tech Services (see appendix IV), the annulus created in CIPP (referred to as "Cast in Place" in the note), made it wholly unsuitable for the project. Tru-Seal is referred to as ASC in the analysis

---

[21] Testing of A Polyurea Liner for Cured In Place Pipe (CIPP) Application, C. Vipulanandan, Ph.D., P.E., Chairman and Professor, Director of CIGMAT
[22] Interview with Gary Oradat, Deputy Director, City of Houston, Public Works & Engineering. 7/3/03.

Tru-Seal, Inc                    March 2004                    

(American Safety Coat, a predecessor of Tru-Seal, owned and operated by Kent Weisenberg).

The private sector may set its own standards for acceptance of new technologies in the remediation of pipelines, based on utility rather than ordinance.

Tru-Seal, Inc                              March 2004                          

## *Market Entry*

Tru-Seal will start operations in Houston, Detroit and other MI areas, and then expand out in Phase II to other cities around the country.  Cities will be selected on a basis of need and receptiveness to new technologies.  At present, it is anticipated that additionally Atlanta, Miami, Birmingham and New Orleans will be marketed to during Phase I in preparation for entry during Phase II.  The rationale around market entry targets is as follows:

- **Houston**:  Significant preliminary discussions have been held with various city officials and engineering firms.  The connections and relationships held by Ms. Joiner (see Management bio's), will be key in aiding accelerated acceptance and testing in the area.  In particular the role of M.U.D.'s in the selection of service providers to execute remediation projects in their jurisdiction may lead to advantages in developing early adoption.  Mr. Weisenberg additionally holds key working relationships with consulting engineers and Houston Public Works directors responsible for pipeline remediation work

- **Detroit:**  Mr. Weisenberg in his previous role (owner, operator of American Safety Coat) has already completed several pipe remediation jobs in the Detroit region and has established relationships including private sector clients.  Visuron, the key supplier to Tru-Seal is located near Detroit, as are the engineering firms who have completed much of the construction of the prototype units.  Operating in the Detroit area will thus shorten logistics and delivery times in the early stages, and facilitate rapid response in the event that modifications and improvements need to be made.

- **Atlanta:** The EPA is active in monitoring and enforcing remediation requirements nationwide.  Essentially the EPA will review a City's environmental and health compliance and make recommendations regarding the requirement for improvements that will need to take place on the infrastructure to reach compliance.  Generally, to reach a standard required is cost prohibitive to the city, leaving it few options.  Ignoring the demand leads to law suits, usually resolved through arbitration where the City negotiates in the context of what it can afford.  A consent decree is issued whereby the EPA accepts a compromised remediation initiative.  This process points the way to Cities with the greatest need for cost-effective solutions to pipeline remediation.  Atlanta has a consent decree for $1.8 Billion, which to date has been largely ignored, the city choosing to pay the fine instead.  In 2004, the EPA plans to escalate the fine to $1 MM per day, at which point Atlanta will be forced to work on a solution.   Atlanta is therefore aggressively pursuing new technologies and cost effective alternatives.

Tru-Seal, Inc                    March 2004



- **New Orleans**:  Similar to above

- **Birmingham, Alabama**: Similar to above

- **Miami**: Florida has recognized that the annulus problem associated with CIPP installation does not resolve their problems of ground water leakage and have determined that all processes of remediation now require grouting.  This will give Tru-Seal an additional cost advantage over competitors, since the grouting process is included within basic costs for SIPP™.  The Miami Dade Water and Sewer Department currently serves a customer base of over 300,000 retail customers and eleven wholesale customers.   The gravity collection system consists of almost 14,551,000 feet of pipe and 975 pump stations.  They treat an average of 305 million gallons per day of raw sewage that is transmitted through a network of force mains that is a total of 4,540,000 feet long.  O&M budget runs about $24 million per year, with an average additional $20 million per year in capital upgrades and improvements

**CONFIDENTIAL**

Tru-Seal, Inc                        March 2004                        

# Competitive Analysis

Currently, pipeline remediation is segmented into two sectors, 'exhume and replace' and trenchless. The reduction in surface disruption afforded by trenchless technologies may be an even more important factor than the simple cost advantage. For instance a study by a group of consulting engineers[23] in the UK put the cost of traffic and public disruption in London caused by utilities works at $3bn per year, <u>double the cost</u> incurred by the companies actually undertaking the work

## *Competing Technologies[24]*

**Pipe Bursting**, or in-line expansion: Patented by British Gas in 1980, this method uses the existing pipe as a guide to insert an expansion head which is forced through, causing the pipe to crack open. The expansion head pulls the new pipe into place. This technique can actually replace existing pipe with a pipe of larger diameter. Laterals need replacing. Requires excavation of a large pit for pushing equipment and pipe feed.

**Slip lining**: A liner of smaller diameter is inserted into the existing pipe. The manhole does not provide sufficient access for this technique, and an insertion pit must be dug for each section. This is therefore not a completely trenchless operation, but requires considerably less excavation than traditional techniques. The annular space between the new pipe and the old must be grouted to prevent fluid flow. Laterals need to be re-cut using CCTV guided robotic. A new form of sliplining, "Spiral Wound", uses interlocking edges to 'form' a pipe as the material is wound in a spiral into the existing pipe.

**Cured In Place Pipe**: A flexible fabric liner, coated with a thermosetting resin, is inserted into the existing pipeline. The resin is then cured to form a new pipeline. The most common method involves inverting a liner into the existing pipe, via a manhole. Hot water is circulated to cure the resin that is now pressed against the inner walls of the existing pipe. Thermal contraction during curing, and catalyst leaching can cause annulus space. Lateral openings need to be re-cut using CCTV guided robotic.

**Modified Cross Section Lining**: The replacement pipe's diameter is modified either by folding (fold and form) into a U shape, or compression. The new pipe is extruded into the existing pipe and then reformed to create a tight fit. The integrity of the fit is critical to prevent annulus voids. Lateral openings need to be re-cut using CCTV guided robotic.

---

[23] Jason Consultants
[24] See EPA "Collection Systems O&M Factsheet, Trenchless Sewer Rehabilitation" for a more detailed discussion (EPA 832-F-99-032)

Tru-Seal, Inc                    March 2004                    

The existence of an annulus allows communication of fluid between leak points (or merely laterals), which results in a diversion, but not a cure of any leakage. There is a growing body of opinion that supports pre-intervention grouting[25] as the only way to ensure that leaks are cured permanently rather than temporarily covered up. In Florida, for example, approximately 15 municipalities currently require grouting in conjunction with CIPP rehabilitation to prevent ground-water contamination. It is predicted that a state wide requirement will be adopted within two to three years.

The re-establishment of laterals (for instance the pipes from homes to the trunk line) is a key element of each process. A CCTV is used on a robotic system, to locate the laterals and then cut open the new pipe. Currently this technique is only about 70% accurate which results in substantial voids around the lateral intrusion. To ensure the integrity of the system, these openings *should* subsequently be grouted to reduce communication via annular spaces.

**Sealed In Place Pipe (SIPP™):** The Tru-Seal system actually constructs a new pipe inside the original pipe, conforming to all surface irregularities and building and sealing around the laterals. The new pipe has structural strength to the same or greater degree as CIPP, but by physical adherence to the pipe, it becomes additive, and mutually supportive, to the original pipe strength. The system effectively uses the original pipeline as a mold for *Structural,* creating a structural replacement pipe conforming to all the internal and external shape irregularities, intrusions and extrusions, consequently eliminating any possibility for annulus voids to form.

Additionally, since the SIPP™ system works on umbilical hoses, the pipeline remediation can be executed with minimal surface disruption – all other methods require the placing of significant surface equipment above the manhole, often access to these manholes requires digging up driveways, back yards, trees, fences etc, increasing time, cost and inconvenience. Alternatively, pits are required.

## *Competing Companies*

Web directory searches list just over 100 'trenchless technology, pipe remediation' contractors worldwide. The "trenchless information center" on the web lists 33 US contractors dealing with trenchless remediation of pipe. The evolution of the industry supports this low fragmentation: the leading trenchless remediation technology is CIPP,

---

[25] Grouting is the act of pumping epoxy into any leak points to form a hard gel with the ground around the pipe. A double packer is placed across the leak and epoxy is pumped into the central space, forcing it through the leak and out into the surrounding material. The grout forms a hard gel with ground material, both curing the leak and re-building the support around the pipe

Tru-Seal, Inc                    March 2004                    

The technology was licensed to Insituform[26] in the US. Insituform subsequently licensed the technology to regional contractors, but in recent years has been buying back its licensees, most recently Insituform Technologies East in June of 2003. In recent years, patent protection has expired enabling independent companies to set up CIPP operations, which has had an impact on Insituform's market share and pricing.

Subsequent technology developments, such as sliplining, and 'fold and form', have slowly gained recognition in the industry, and grown in market penetration.

**Insituform**[27] in 2002, achieved revenues of $480,358,000, operating income of $50,183,000, and net income of $22,691,000. Remediation activities operate at a margin of 27%. INSU is by far the dominant company in the industry, and will be most active as an aggressive competitor.

Insituform's pipe rehabilitation revenues in 2002 were $377 million, 85% of which was contributed by CIPP activities. The remaining 15% comprised sliplining, pipe-busting and micro-tunneling.

By selective bidding, and timing of work, Insituform maintains its operating crews at, or near capacity, minimizing operating overhead burden.

## *Cost Comparison*

Direct comparison of CIPP process to SIPP™ is complicated by the fact that the SIPP™ process necessarily includes grouting of system leaks to ensure that water ingress does not occur during spray application. (Grouting adds significant value to the process, as it ensures long term integrity of the remediation and prevents inflow and infiltration). This provides additional physical integrity to the remediation. Grouting is increasingly considered as an important element of the remediation process, and therefore should be considered as a benefit of the Tru-Seal process. Despite this additional step and associated cost, SIPP™ is estimated to be approximately 20% cheaper than CIPP[28]. This assumes a 30% margin for SIPP™, and 'averaged' costs for all ancillary processes.

The following charts demonstrate the cost of pipeline remediation utilizing CIPP, Spiral Wound, and Slip-lining techniques. The data[29] is taken from a range of actual jobs in Canada. Each job reported included project cost, it is reasonable to assume that project cost will incorporate actual remediation cost and additional associated costs. The trend

---

[26] Ticker INSU
[27] INSU. For full discussion of operating results and business environment, see SEC 10-K March 2003.
[28] Appendix "Cost Analysis for SIPP Application"
[29] Data compiled in a report by the National Research Council Canada; "Construction and Rehabilitation Costs for Buried Pipes with a focus on Trenchless Technologies."



Tru-Seal, Inc                          March 2004

lines, shown in the second chart, can be assumed to represent those jobs with the minimum ancillary activities (such as service reconnection – i.e. laterals from the trunk pipe to the home need to be re-established), and therefore establish a baseline for remediation cost. The data demonstrates that below about 15" diameter, the cost remains reasonably constant, operational costs becoming the dominant factor.    It can be reasonably concluded that this baseline cost of CIPP is significantly higher than SIPP™.

The data demonstrates that competing technologies cannot reduce pricing below about $42 per foot, regardless of pipe diameter. Comparison of the actual bid spreadsheets in the appendix show some bids in the range of $22 per foot, but this is more indicative of price structure than pricing – in each case a different line item (usually 'service reconnections') is significant and brings the total back in line with this analysis.

Tru-Seal, Inc                       March 2004                                



*Pipeline remediation Costs*

Tru-Seal, Inc                    March 2004                         

# Marketing Plan

In order to gain approval at the city level for public sector jobs, *Structural* will look for approval as a 'cured in place pipe' system, i.e. based on comparison performance to generic CIPP. This will give the relevant authorities a benchmark against which to assess performance. Simultaneously, we will pursue independent approval as a new technology based on the properties of *Structural* as distinct and superior to CIPP. We believe that *Structural* offers advantages above and beyond the basic CIPP qualification, and will market these advantages hard in phase II of the launch. Engineering contractors specify CIPP for public bid, therefore qualification as a CIPP system enables Tru-Seal to immediately participate in these bid opportunities.

Further information on public sector attitude and adoption of new technology is available in Appendix II, which documents results of an informal survey made to public works directors.

## *Value Proposition*

Tru-Seal offers a superior product to current trenchless technologies. Specifically:

- Maintains physical properties without losing mechanical strength (CIPP is estimated to lose 35% of its flex modulus over the first year, due to gradual leeching of the chemical catalyst). Structural has no catalyst, therefore, no leaching.

- Application process in host pipe ensures zero annulus effect, vs. CIPP where annulus is formed during cooling and curing of the pipe.

- Minimal surface disruption. The use of umbilicals and robots enables Tru-Seal to set up remotely from the manhole, eliminating the requirement to uproot backyards, move trees, eliminate fences, dig up driveways and demolish temporary constructions. This is extremely important when dealing with residential properties and can enhance goodwill; but additionally can create a huge cost advantage, including indirect economic advantages through lower disruption of auto and pedestrian traffic.

- Complete preliminary grouting ensures that any major voids or fractures are corrected prior to installation of SIPP™. This eliminates the problem rather than patching over it as is the current procedure of competing technology.

- Better integration of laterals into system. The *Structural* pipe will 'feather' into the lateral, making it part of the system rather than having to cut out and re-seal lateral connections.

Tru-Seal, Inc                    March 2004                    

- Safety.  No pressurized, high temperature water pumps, no mechanical issues inserting one pipe into another, less surface hardware.  All adds up to a safer working environment.

- Low price.  Tru-Seal will be able to offer the low price bid against current technology.  And if ancillary cost effects (such as surface interference) are considered, this becomes even more significant.

During Phase I, **Structural** will aim to be the low price bidder for the jobs that are considered strategic (geographical diversity within targets, diameter diversity and public / private pipelines). The Tru-Seal objective will be to price 10 to 15% below our competitors, to increase probability of selection for the projects. Extensive costing to date indicates that this costing goal is attainable.

In phase II, pricing will be used to manage capacity, **Structural** will be promoted as the high quality alternative.

During Phase I, Tru-Seal will support bids only in those areas specified in the operating plan.  Bidding will be done based upon specific knowledge and in cooperation with a general contractor who will be able to perform ancillary services.  This will require creation and management of these partnerships in advance of work proposals.

During Phase I, all general promotion will be kept to a minimum, and public knowledge of the system will be avoided.  During this stage, it is important to keep a low profile to gain as much strength as possible prior to competitor reaction.

Marketing will be restricted to personal representation to the City Public Works departments and engineering firms in order to gain permission to perform demonstration jobs, M.U.D. groups and select manufacturing companies such as GM in Detroit).

During Phase II, Tru-Seal will start general promotion in an attempt to gain market presence and recognition.  The main focus will remain on personal representation to City Public Works departments and engineering firms, but additionally, Tru-Seal will seek membership of relevant associations, create white papers for conferences and publications, and advertise in trade journals:

Membership Associations

- Polyurea Development Association
- Gulf Coast Trenchless Association
- North American Society for Trenchless Technology
- Midwest Society for Trenchless Technology

CONFIDENTIAL

Tru-Seal, Inc                               March 2004                          

Publications

- Underground Construction Magazine
- Rehabilitation Technology Magazine
- Trenchless Technology Magazine
- No-Dig Engineering Technical Journals

Conferences

- Rehab Showcase
- Rehab Road Shows
- AWWA Conference & Exposition
- APWA International Public Works Congress & Exposition
- WEFTEC 2004 Annual Conference & Expo
- UIATC - Underground Infrastructure Advanced Technology Conference
- PDA Annual Conference
- Association of Water Board Directors's (AWBD) Texas only